**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> *Defendant*. |

Civil Action No. 1:15-cv-309-CKK

**MEMORANDUM OPINION**
(August 18, 2016)

Plaintiff People for the Ethical Treatment of Animals ("PETA") submitted a Freedom of Information Act ("FOIA") request to Defendant United States Department of Health and Human Services ("HHS"), Centers for Disease Control and Prevention ("CDC"), seeking records submitted by importers of nonhuman primates to CDC pursuant to certain agency regulations.

Presently before the Court are Defendant [17] Motion for Summary Judgment and Plaintiff [24] Cross-Motion for Summary Judgment. Upon consideration of the parties' submissions,[1] the relevant legal authorities, and the record as a whole, the Court shall GRANT-IN-PART and DENY-IN-PART both motions for summary judgment. Specifically, the Court finds that:

- CDC has met its obligations under FOIA to perform an adequate search for records responsive to Plaintiff's FOIA request.

---

[1] The Court's consideration has focused on the following documents: Defendant's Motion for Summary Judgment, ECF No. [17]; Plaintiff's Response and Cross-Motion for Summary Judgment, ECF No. [23]; Defendant's Reply in Support of its Motion and Opposition to Plaintiff's Cross-Motion, ECF No. [27]; Plaintiff's Reply in Support of its Motion, ECF No. [31]; and Plaintiff's Notice of Supplemental Authority, ECF No. [34]. In addition, the Court has reviewed the records produced by Defendant to Plaintiff in response to its FOIA request. *See* Documents Produced to Plaintiff on 6/4/2015 and 7/8/2015, ECF Nos. [33-1 ]- [33-5].

- Four categories of information requested by PETA—the *quantity of animals imported*, the *descriptions of crates used in shipments*, the *names of the companies that export the animals*, and *the names of the airline carriers that transport the animals*—qualify for protection pursuant to FOIA Exemption 4.

- One category of information requested by PETA—the *names of the species of animals imported*—does not qualify for protection pursuant to FOIA Exemption 4.

- Three NHP importers—Central State Primate, Dallas Zoo Management, and SBNL USA—have chosen not to object to the disclosure of the records that they have submitted.   Accordingly, Plaintiff is entitled to each of the five categories of information that it has requested in the records submitted by these three non-objecting companies.

- CDC has shown with "reasonable specificity" that it has segregated all non-exempt information in its productions to PETA.

- The *Vaughn* Index submitted by CDC contains errors and deficiencies that require correction.

The Court notes that in preparing this Memorandum Opinion, the Court has reviewed copies of all 1,575 records produced by Defendant to Plaintiff in response to its FOIA request.  *See* Documents Produced to Plaintiff on 6/4/2015 and 7/8/2015, ECF Nos. [33-1] - [33-5].

## I.  BACKGROUND

On May 19, 2014, CDC received a FOIA request, dated May 16, 2014, from Lindsay Waskey on behalf of PETA.  Def.'s Stmt. ¶ 1.  PETA's FOIA sought (1) "[a]ll records submitted to CDC pursuant to 42 C.F.R. § 71.53(n)(2) from May 1, 2013 to the date this request is processed" and (2) "[a]ll records submitted to the CDC pursuant to 42 C.F.R. § 71.53(g)(1)(i) and (g)(1)(ii) from May 1, 2013 to the date this request is processed."  *Id.* ¶ 2.  The regulations cited in the request concern the "prevent[ion of] the introduction, transmission, and spread of

communicable diseases" "from nonhuman primates (NHPs) imported into the United States[.]" 42

C.F.R. § 71.53.[2]

---

[2] Specifically, 42 C.F.R. § 71.53(n)(2) requires that  importers must provide certain information to CDC prior to importation of a shipment of nonhuman primates (NHPs):

> (i) importer's name and address; (ii) number and species of NHPs being imported; (iii) description of crates; (iv) means of individually identifying NHPs; (v) origin of NHPs, including country, exporter, and exporter's address; (vi) use of NHPs under paragraph (h) of this section; (vii) specific itinerary with names, dates, flights, times, airports, sea ports, and responsible parties to contact at every step of travel, including all ground transportation; (viii) port of entry; (ix) if arriving by flight, name of the airline and its flight number; (x) if arriving by vehicle, name of the vehicle's owner and its license plate number; (xi) if arriving by ship, name of the ship and its vessel number; and (xii) name and address of the destination quarantine facility; (xiii) name, address, and contact information for shipper, if other than the importer; (xiv) if applicable, name, address, and contact information for broker in the United States; (xv) name, address, and contact information for the person(s) responsible for off-loading NHPs in the United States; (xvi) name, address, and contact information for any party responsible for ground transportation from port of entry to quarantine facility; (xvii) expected quarantine facility, if different from the importer; (xviii) master air waybill number for shipment; And (xix) CITES permit number and expiration date.

42 C.F.R. § 71.53(n)(2).  In addition, 42 C.F.R. § 71.53(g)(l)(i) and (g)(l)(ii) specify CDC registration requirements for new NHP importers or those renewing their registration:

> Before importing any live NHP into the United States. . . an importer must register with and receive written approval from the Director.  To register, or to renew a registration certificate, as an importer, a person must submit the following documents to HHS/CDC:  (i) a completed registration/application form; (ii) a completed statement of intent that describes the number and types of NHPs intended for import during the registration period, the intended permitted purposes for which the NHPs will be imported[.]

42 C.F.R. §§ 71.53(g)(l)(i), (g)(l)(ii).

By letter dated May 19, 2014, the CDC FOIA Office sent an acknowledgement letter to PETA. Def.'s Stmt. ¶ 3. PETA was informed that the requested documents were maintained in areas of CDC outside of the CDC FOIA Office, and CDC would be unable to comply with the twenty-working day time limit or the ten additional days provided by the statute. *Id.*

On May 19, 2014, the CDC FOIA Office sent the FOIA request and directions for processing the request to the Office of Infectious Diseases, National Center for Emerging and Zoonotic Infectious Diseases (NCEZID). *Id.* ¶ 4. The CDC FOIA Office chose NCEZID to conduct the search because that office handles the primate importation issues which fell within the scope of the regulations cited in the FOIA request, and the FOIA Office believed that NCEZID was the office most likely to collect and/or maintain responsive records. *Id.*; *see also* Norris Decl., ECF No. [18-1], ¶ 8.

In August 2014, CDC informed PETA that because of the nature of the documents required by PETA, and in order to comply with Executive Order No. 12600—which requires Federal agencies to notify submitters when such requests are received and to provide submitters the opportunity to identify information within their records deemed to be confidential, commercial, or financial material—CDC's estimated response time would be thirty-six months from August 2014. Def.'s Stmt. ¶ 15. On March 3, 2015, PETA filed the instant suit, seeking the documents requested in its initial FOIA request. *See* Pl.'s Complaint, ECF No. [1].

On March 26, 2015, CDC's FOIA Office received NCEZID's response to Plaintiff's FOIA request. Def.'s Stmt. ¶ 15. NCEZID indicated that it had performed an electronic search in its central repository for all documents related to the importation of nonhuman primates and that NCEZID had identified 1,575 responsive records. *Id.* ¶¶ 15-17. NCEZID provided the 1,575 responsive records to CDC's FOIA Office. *Id.* ¶ 18.

On April 7, 2015, pre-disclosure notifications were sent to ten entities which had provided the responsive records to CDC during the relevant time perirod.  *Id.* ¶ 19.[3]  As part of their businesses, each of these entities participates in the importation of non-human primates into the United States.  *Id.* ¶ 22.  Seven of the ten entities provided responses to the predisclosure notifications:  (1) Bartons West End Farms, Inc., (2) Buckshire Corporation, (3) Charles River, (4) Covance Research Products, (5) PTLC/Primate Products, (6) Valley Biosystems, and (7) Worldwide Primates, Inc.  Norris Decl., ECF No. [18-1], ¶ 22.  Three entities did not provide responses:  (8) Central State Primate, (9) Dallas Zoo Management, and (10) SBNL USA.  *See id.*; *Vaughn* Index, ECF No. [17-15], at 2.

On June 4, 2015, CDC released to Plaintiff 669 pages of responsive records.  Def.'s Stmt. ¶ 22.  On July 8, 2015, CDC released to Plaintiff 906 pages of responsive records.  *Id.* ¶ 23.  In total, CDC released 1575 pages of responsive records.  CDC withheld approximately 144 pages in full and many other pages in part, citing FOIA Exemptions 4 and 6.  *See id.*

The records produced by CDC contain several dozen categories of information relating to the importation of shipments of nonhuman primates, or "NHPs."  Plaintiff, however, seeks only five categories of information provided to CDC:  (1) the species of animals imported, (2) the quantity of animals imported, (3) the descriptions of crates used in shipments, (4) the names of the companies that export the animals, and (5) the names of the airline carriers that transport the animals.  *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23], at 1.  As to those five categories of

---

[3] The *Vaughn* Index identifies ten importers that provided responsive records to CDC during the relevant time period, but the responsive documents provided to Plaintiff reference one additional importer, Shared Enterprises.  *See* Pl.'s Resp. Stmt. ¶ 19; Exhibit W to Pl.'s Opp'n and Cross-Motion, ECF No. [23-27].  However, an affidavit submitted by CDC indicates that Shared Enterprises was not a registered importer during the timeframe in question, and therefore no responsive records pertaining to that organization were found.  *See* Norris Supp. Decl., ECF No. [27-5], ¶ 7; Def.'s Resp. Stmt. ¶ 54.

information, Plaintiff contends that CDC has wrongfully withheld information under FOIA.

PETA does not seek any other categories of information.  *Id.* at 1, n.1.

On October 13, 2015, Defendant filed its Motion for Summary Judgment, and on

November 25, 2015, Plaintiff filed its Cross-Motion for Summary Judgment.  The motions are

now ripe for resolution.

## II.  LEGAL STANDARD

Congress enacted FOIA to "pierce the veil of administrative secrecy and to open agency

action to the light of public scrutiny."  *Dep't of the Air Force v. Rose,* 425 U.S. 352, 361 (1976)

(citation omitted).  Congress remained sensitive to the need to achieve balance between these

objectives and the potential that "legitimate governmental and private interests could be harmed

by release of certain types of information."  *FBI v. Abramson,* 456 U.S. 615, 621 (1982).  To that

end, FOIA "requires federal agencies to make Government records available to the public,

subject to nine exemptions."  *Milner v. Dep't of Navy,* 562 U.S. 562, 562 (2011).  Ultimately,

"disclosure, not secrecy, is the dominant objective of the Act."  *Dep't of Air Force v. Rose,* 425

U.S. 352, 361 (1976).  For this reason, the "exemptions are explicitly made exclusive, and must

be narrowly construed."  *Milner,* 562 U.S. at 565 (citations omitted).

When presented with a motion for summary judgment in this context, the district court

must conduct a "de novo" review of the record, which requires the court to "ascertain whether

the agency has sustained its burden of demonstrating the documents requested . . . are exempt

from disclosure under the FOIA."  *Multi Ag. Media LLC v. Dep't of Agriculture,* 515 F.3d 1224,

1227 (D.C. Cir. 2008) (citation omitted).  The burden is on the agency to justify its response to

the plaintiff's request.  5 U.S.C. § 552(a)(4)(B).  "An agency may sustain its burden by means of

affidavits, but only if they contain reasonable specificity of detail rather than merely conclusory

statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Multi Ag. Media,* 515 F.3d at 1227 (citation omitted). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. Civil Liberties Union v. U.S. Dep't of Defense,* 628 F.3d 612, 619 (D.C. Cir. 2011) (citations omitted). "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. U.S. Dep't of State,* 641 F.3d 504, 509 (D.C. Cir. 2011) (citation omitted). Summary judgment is proper when the pleadings, the discovery materials on file, and any affidavits or declarations "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

An agency also has the burden of detailing "what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force,* 566 F.2d 242, 261 (D.C. Cir. 1977). Any nonexempt information that is reasonably segregable from the requested records must be disclosed. *Oglesby v. U.S. Dep't of the Army,* 79 F.3d 1172, 1176 (D.C. Cir. 1996).

## III. DISCUSSION

The Freedom of Information Act requires federal agencies, in responding to a request for information, to: (1) conduct an adequate search for that information through reasonable efforts; (2) provide the information to the requester, unless it falls within a FOIA exemption; and (3) provide to a requester any information that can reasonably be segregated from the exempt information.

5 U.S.C. § 552(a)(3); 5 U.S.C. § 552(b).   In response to Plaintiff's FOIA request, CDC has withheld portions of documents pursuant to Exemptions 4 and 6 of the FOIA, 5 U.S.C. §§ 552(b)(4), 552(b)(6).

Plaintiff challenges the reasonableness of CDC's search and contends that CDC has failed to remedy deficiencies that are present in CDC's *Vaughn* Index.  *See* Pl.'s Cross-Motion, ECF No. [23-1], at 32-37; Pl.'s Reply, ECF No. [31], at 23-25.  Plaintiff also challenges CDC's withholding of portions of records under Exemption 4.  *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 8.  CDC's withholding of portions of records under Exemption 6 is not in dispute, as none of the information withheld pursuant to Exemption 6 falls within the five categories of information now sought by Plaintiff.  *See* Def's Opp'n and Reply, ECF No. [28], at 2-3; Pl.'s Reply, ECF No. [31], at 1 n.1.

## A. <u>Adequacy of Search</u>

In its Opposition and Cross-Motion for Summary Judgment, Plaintiff contends that CDC failed to perform an adequate search in response to Plaintiff's FOIA request.  *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 35-37.

Specifically, Plaintiff points to the fact that its FOIA request included "[a]ll records submitted to CDC pursuant to 42 C.F.R. § 71.53(g)(1)(i) and (g)(1)(ii) from May 1, 2013 to the date this request is processed."  Pl.'s Complaint, ECF [1], at ¶ 9.  Under this regulation, "[b]efore importing any live [primate] into the United States, . . . an importer must register with and receive written approval from the Director." 42 C.F.R. § 71.53(g).  To register or renew registration, the importer "must submit the following documents to HHS/CDC: (i) a completed registration/application form; (ii) a completed statement of intent that describes the number and

types of [primates] intended for import during the registration period, the intended permitted purposes for which the NHPs will be imported . . . ." *Id.* at § 71.53(g)(1).

Plaintiff argues that CDC failed to perform an adequate search because CDC "has not produced a single registration form or statement of intent." Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 36. Plaintiff contends that CDC "should have located multiple registration forms and statements of intent in the course of a reasonable search," citing the fact that "at least ten companies imported primates during the relevant time period." *Id.* Plaintiff further contends that CDC "never even looked for these documents" and instead focused "only on documents relating to *individual shipments*." *See id.* at 37 (citing FOIA Response Sheet, Exhibit K to Norris Declaration, ECF No. [17-12], at 6) (emphasis added).

In response, CDC points out that the regulation at issue addresses only *new* NHP importers or those NHP importers that are renewing their registration." Def.'s Opp'n and Reply, ECF No. [28], at 30; *see also* 42 C.F.R. § 71.53(g) (titled "Registration or renewal of importers," quoted in footnote 2, *supra*). Defendant has also produced a supplemental declaration from CDC's FOIA Officer, Katherine Norris, which indicates that on July 15, 2014, CDC's Medical Officer, Dr. Robert J. Mullan, conducted a search of CDC's electronic "QARS" database for records submitted to CDC pursuant to 42 C.F.R. § 71.53(g)(1)(i) and (ii). *See* Supp. Norris Decl., ECF No. [28-5], at ¶ 20.[4] According to the declaration submitted by CDC, Dr. Mullan conducted the search by "utilizing a line listing of all nonhuman primate shipments arriving during the period requested." *Id.* Dr. Mullan first used the term "Date of Arrival", of NHP shipments, which then produced a list of all the QARS

---

[4] Dr. Robert J. Mullan is a Medical Officer for the CDC's Division of Global Migration and Quarantine (DGMQ), National Center for Emerging Zoonotic and Infectious Diseases (NCEZID). He conducted an electronic search of the Quarantine Activity Reporting System (QARS), the central repository for all documents relating to importation of nonhuman primates, by date of importation. Supp. Norris Decl., ECF No. [28-5], at ¶ 15.

numbers for shipments arriving during the request period. *Id.* Dr. Mullan then located and reviewed each QARS record to which the importers' shipment notifications were attached. *Id.* No responsive records were located. *Id.*

In addition, in response to PETA's assertion that CDC did not perform an adequate search for records responsive to PETA's FOIA request, Dr. Mullan conducted a subsequent search by reviewing agency documents that indicated what companies were registered at any given time, for the purpose of determining whether any NHP importers registered or reregistered in the time period between May 1, 2013 and May 19, 2014. *Id.* ¶ 21. According to the declaration submitted by CDC, no responsive records were located, as there were no new or renewing applicants for non-human primate importation registrations during this time period. *Id.* ¶ 22. The declaration also states that "each step in the handling of Plaintiff's request has been entirely consistent with the CDC's procedures adopted to insure an equitable response to all persons seeking access to records under the FOIA." *Id.* ¶ 21.

Upon review of the parties' submissions, the Court finds that CDC has performed an adequate search for records responsive to Plaintiff's FOIA request. *See DiBacco v. U.S. Army*, 795 F.3d 178, 194-95 (D.C. Cir. 2015). A FOIA search is sufficient if the agency makes "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006) (quoting *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C.Cir.1995)). Here, the declarations submitted by CDC explain "in reasonable detail the scope and method of the search conducted by the agency [sufficient] to demonstrate compliance with the obligations imposed by the FOIA." *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982). Furthermore, the record evidence demonstrates that in addition to its initial search for documents, PETA conducted a subsequent search in response to PETA's assertion that CDC had not

performed an adequate search for records.  *See* Supp. Norris Decl., ECF No. [28-5].  The Court notes

that the adequacy of that subsequent search has not been disputed by PETA in its Reply brief.  *See*

Pl.'s Reply, ECF No. [31].

In light of the foregoing, the Court finds that CDC has met its obligations under FOIA to

perform an adequate search for records responsive to Plaintiff's FOIA request.  *See DiBacco*, 795

F.3d at 194-955, quoting *Meeroopol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986) ("[A]dequacy is

measured by the reasonableness of the effort in light of the specific request.").

## B.  FOIA Exemption 4

CDC relies upon Exemption 4 of FOIA as a basis for withholding each of the five categories

of information sought by Plaintiff:  (1)  the species of animals imported, (2) the quantity of animals

imported, (3)  the descriptions of crates used in shipments, (4)  the names of the companies that

export the animals, and (5)  the names of the airline carriers that transport the animals.  Exemption

4 protects "commercial or financial information obtained from a person and privileged or

confidential."  5 U.S.C. § 552(b)(4).[5]  To invoke the exemption, an agency must show that "the

information is:  (1) commercial or financial; (2) obtained from a person, and (3) privileged or

---

[5] Exemption 4 also protects information that can properly be considered "trade secrets." 5 U.S.C.
§ 552(b)(4).  CDC does not argue that the exporter names or animal species, quantities, or crate
information are trade secrets.  *See* Def.'s Summ. J. Mem., ECF No. [17], at 24-33.  CDC does,
however, make a perfunctory argument that "the names of carriers used" are trade secrets
because "transportation methods are commercially valuable plans which are the end product of
substantial effort."  *Id.* at 30.  CDC's argument is unavailing.  The record evidence indicates that
"the names of carriers used,"—while they may constitute confidential commercial information—
are not "trade secrets."  In fact, PETA has produced a publicly available list of airlines that are
legally registered to ship primates for experimentation.  *See* Pl.'s Opp'n and Cross-Motion, ECF
No. [23-1], at 27; Goodman Decl., ECF No. [23-4], ¶ 19; Exhibit S to Goodman Decl., ECF No.
[23-23].  Accordingly, the Court finds that trade secrets are not at issue in this case.  *See Nat'l
Bus. Aviation Ass'n, Inc. v. F.A.A.*, 686 F. Supp. 2d 80, 85 n. 7 (D.D.C. 2010) (concluding that
"[t]rade secrets are not at issue" in a case involving the release of certain aircraft registration
numbers that could be used to obtain the owner's name, the make, and the model of the aircraft).

confidential." *Canadian Commercial Corp. v. Dep't of Air Force,* 442 F. Supp. 2d 15, 30 (D.D.C.2006), *aff'd,* 514 F.3d 37 (D.C. Cir. 2008).

At the outset, the Court notes that PETA does not dispute that the information at issue was obtained from a "person" and is "commercial."  *See* Pl.'s Cross-Motion, ECF No. [23-1], at 8. Accordingly, the Court's analysis shall focus on the sole issue of whether the information at issue is "privileged or confidential" for the purposes of Exemption 4.  To determine whether information is "privileged or confidential," a court "must first determine whether the requested information was submitted voluntarily or whether its submission was required."  *Pub. Citizen Health Research Grp. v. Nat'l Institutes of Health*, 209 F. Supp. 2d 37, 45 (D.D.C. 2002) (citing *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 304 (D.C. Cir. 1999)).  Here, it is undisputed that in connection with the importation of primates into the United States, an importer "must notify HHS/CDC" of the shipment and provide nineteen discrete categories of information, including the "[n]umber and species of NHPs being imported," a "[d]escription of crates" used in the shipment, "the exporter," and "the name of the airline." 42 C.F.R. § 71.53(n)(2).  Accordingly, the submission of the information at issue is "unquestionably required."  Pl.'s Cross-Motion, ECF No. [23-1], at 8; *see also* Def.'s Opp'n and Reply, ECF No. [28], at 6.

Where, as here, information was submitted to the Government involuntarily, such information is considered "privileged or confidential" if disclosing it would either (1) "cause substantial harm to the competitive position of the person from whom the information was obtained" or (2) "impair the Government's ability to obtain necessary information in the future."  *Nat'l Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974) ("*Nat'l Parks I*"); *see also Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 878 (D.C. Cir. 1992). The United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has

cautioned that "conclusory statements" are insufficient to meet the Government's burden on these issues. *See Multi Ag. Media,* 515 F.3d at 1227.

        1.   <u>Substantial Competitive Injury</u>

To prove a likelihood of substantial competitive harm, HHS must prove that (1) the submitters of the information "actually face competition" and that (2) "substantial competitive injury [to the submitters] would likely result from disclosure." *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 679 (D.C. Cir. 1976) ("*Nat'l Parks II*"). Here, it is undisputed that the NHP importers submitting the information in question "actually face competition." *Id.* Accordingly, the Court's analysis shall focus on the second element—whether "substantial competitive injury" to the NHP importers submitting the information would likely result from disclosure. *Id.*

**a.  Proof of Substantial Harm**

      i.   <u>Legal Framework</u>

In FOIA cases involving the commercial importation industry, courts have found that a commercial importer faces substantial competitive harm where disclosure of the requested information would compromise valuable business data, such as the importer's "intentions, profit margin, and other plans,"[6] the quantity and specific description of the exact product imported by the importer,[7] the importer's "sources of supply, product lines, supply chains and customers,"[8] and

---

[6] *See Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1026 (D.C. Cir. 1999).

[7] *See Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot.*, 588 F. Supp. 2d 51, 56 (D.D.C. 2008)

[8] *See Gilda Indus. v. U.S. Customs and Border Protection Bureau*, 457 F. Supp. 2d 6, 11 (D.D.C. 2006)

the importer's "supply chains, patterns of importation and distribution, assessments of customer demands and business relationships."[9]

In each case, the court found that the publication of the information at issue would provide competitors with information regarding specific shipments at specific times that would be valuable to competing importers.  For example, in *Trans-Pacific Policing Agreement*, the D.C. Circuit upheld the district court's determination, based on detailed affidavits submitted by experienced Customs officials, that a competitor could link the tariff numbers sought in the FOIA request to specific shipments and thereby uncover valuable information concerning the "nature, cost, profit margin, and origin of the shipments."  177 F.3d at 1026.  In *Gilda Industries*, the district court found that pairing specific importers with the precise products that they imported during a particular three-month period would have been valuable to competitors hoping to gain an edge in the importation market.  457 F. Supp. 2d at 10.  Similarly, in *Customs & International Trade Newsletter v. U.S. Customs and Border Protection*, the district court found that importer names and addresses, when paired with publicly available data revealing the specific goods contained in particular shipments, could be used by competitive importers to gain an advantage over the importers that had submitted the information during the relevant time period.  588 F. Supp. 2d at 57.  Finally, in *Watkins*, the Ninth Circuit, citing precedent established in this circuit, found that the disclosure of the importer's manufacturer and exporter, when paired with publicly available information—including the date of importation, the port of entry, a description of the merchandise, the quantity involved, the country of origin, and the name and address of the importer—would allow competitors to discover the importers' "entire distribution network and demand trends."  643 F.3d at 1196; *see also id.* at 1201 (quoting affidavits submitted by the agency).

---

[9] *See Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1200 (9th Cir. 2011).

ii.    Proof of Substantial Harm

Here, CDC contends that release of the requested information will cause substantial harm to the competitive positions of the NHP importers from which the requested information was obtained.  In support of its position, CDC has cited letters submitted by seven NHP importers that specifically objected to the disclosure of the requested information,[10] and has filed two declarations from its FOIA Officer, Catherine Norris, as well as declarations from executive officers at two of the seven objecting NHP importers:  one declaration from Thomas J. Rowell, the President and Chief Operating Officer at Primate Products Incorporated ("PPI") and another declaration from Ira M. Block, the Chief Executive Officer of Worldwide Primates, Inc. ("WWP").  *See* Norris Decl., ECF No. [18-1]; Norris Supp. Decl., ECF No. [27-5]; Rowell Decl., ECF No. [28-3]; and Block Decl., ECF No. [28-2].  According to the Block declaration,[11] the release of the requested information would result in substantial competitive harm to the NHP importers that submitted the records at issue:

---

[10] As noted in Part I, *supra*, CDC sent predisclosure notifications to the ten NHP importers that submitted the information at issue in this FOIA request.  Seven of the ten companies objected to the disclosure of the requested information through response letters to CDC.  *See* Def.'s Mem., ECF No. [17], at 9 n.2.  CDC has not filed the seven letters with the Court, on the grounds that certain submitters have indicated that the letters themselves are subject to FOIA exemptions.  *See* Def.'s Mem., ECF No. [17], at 24 n.86.  The Court finds it unnecessary to review the seven letters *in camera*, as CDC has put forward other evidence describing the factual grounds for the objections described in the letters, and has described in detail the steps taken by the agency upon reviewing the letters.

[11] The Court shall focus its attention primarily on the Block declaration, as opposed to the Rowell declaration.  As PETA observed in briefing, the declaration of Thomas J. Rowell, the President and COO at PPI, has minimal value regarding the commercial importance of the following types of information:  (1) the species of animal imported, (2) the quantity of animal imported, and (3) the size and number of crates in the shipment.  PPI and CDC failed to redact all three categories of information with respect to the seventy-two documents released by CDC to PETA that concern PPI's import transactions.  *See Vaughn* Index, ECF No. [17-15], at 2; Exhibit A to Supp. Goodman Decl., ECF No. [31-2], at 1, 9, 15, 26, 35, 49, 67.

> There are a limited number of licensed importers of nonhuman primates and they operate in a very competitive environment. While companies may submit the same type of information, the particular information each submits is different based upon the volume of business. Therefore, the release of this information could allow another company to gain valuable insight into the manner in which a company conducts its business. In addition, international companies are also engaged in the importation of NHPs. United States and international companies all compete in the global marketplace. Therefore, international companies can benefit from, and capitalize on, the release of this information the United States companies are required to submit to CDC. This release could allow competitors to learn a company's capacity to obtain, house and transport NHPs. This information could help international and United States importers increase their own importation, grow their market share, and undercut the profitability of the companies submitting the information.

Block Decl., ECF No. [28-2], at 2. Mr. Block further asserts that the disclosure of airlines names

would result in substantial financial harm:

> [T]he ability to locate airlines willing to transport research animals [is] the single most time consuming aspect of the logistical portion of [the NHP importing] business, which also consumes an extensive amount of effort and expense. As such, when a viable transport route is able to be established, we seek to guard this information vigorously. We also seek to protect this information from competition, as the release of this information would allow competitors, both in and outside of the United States, to make use of this information, to the detriment of WWP, and potentially causing us significant financial loss. While a few of the larger importers have been able to use occasional charter flights, this results in increased expenditures because the cost to charter an appropriately sized aircraft can easily reach $500,000.00. The cost of chartering aircrafts is often prohibitive to smaller importers like WWP, which thereby affects their ability to compete for their share of the market. Additionally, there is a bio-security risk in transporting a large amount of animals at one time, as any exposure to a contagious disease

---

As PETA points out in briefing, there is no evidence in the current record that PPI requested that these three categories of information be redacted and that CDC declined. To the contrary, Ms. Norris, CDC's FOIA officer, testified that CDC "applied the level of protection requested by the importer" if "the concerns expressed by an importer were facially reasonable and consistent with the provisions of the FOIA." Supp. Norris Decl., ECF No. [28-5], ¶ 9. Accordingly, there is a reasonable inference that PPI did not request that these three categories of information be redacted.

could result in the destruction of all animals on the charter flight at considerable financial loss.[12]

*Id.* at 2-3.  With respect to the release of exporter's names, Mr. Block asserts the following:

> [R]elationships with exporters are developed at great time, effort and expense.  Rival and emerging companies could use this information to eliminate the time and effort that would otherwise be required to operate well or begin operations in the industry.  In addition, the release of such information would result in substantial competitive harm as it would allow competition (who regularly view information published on various organization web sites as a result of FOIA releases) to determine which suppliers are providing certain species to WWP and approach those suppliers, offering better pricing and terms.  This affects the ability of WWP to compete against larger importers.  Further, if exporter names are revealed, competitors could also seeks (sic) to use these exporters.  Resources from those exporters could become scarce.  This could result in higher prices and/or inferior services of quality by the exporters as they attempt to serve more companies.

*Id.* at 3.  In addition, Mr. Block states that the release of the names of the airlines used, in conjunction with the name of the exporter, could result in substantial competitive injury to the companies submitting this information in one or both of two distinct ways:

> (1)  it could allow a rival importer to reverse-engineer the company's business model and thereby discover unique, otherwise unidentifiable advantages that it provides; and/or

> (2) it could allow a rival importer to exploit weaknesses in the company's business model and thereby gain a competitive advantage.  It could also allow competitors to determine certain shipping routes.

---

[12]  Mr. Block also testifies that disclosure of airline names would result in substantial financial harm to his company on the grounds that historically, the disclosure of airline names has resulted in "harassment of the majority of airlines" by animal rights groups, and that as a result, many airlines "have ceased to transport nonhuman primates as well as other animals destined for legitimate research."  Block Decl., ECF No. [28-2], at 2.  However, any injuries that might flow from protests of airlines by third-party advocacy groups cannot be considered *competitive injuries* "flowing from the affirmative use of proprietary information by competitors."  *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1291 n. 30 (D.C. Cir. 1983).  Accordingly, any predictions of harm based on the potential use of information by non-competitors would not warrant the withholding of that information pursuant to FOIA Exemption 4.  *See, e.g.*, *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 563 (D.C. Cir. 2010).

*Id.*  Finally, Mr. Block states that the combined release of quantities and species imported would also allow competitors to determine the volume of business and possibly interfere with an importer's supply of such species.  *Id.*  Specifically, "the release of the quantity and species could enable a competitor to calculate the percentage of sales based on a particular species, and use that information when analyzing market share and other types of commercial business parameters, which would result in financial and competitive harm as these competitors attempt to increase their market share."  *Id.*

In opposition, PETA contends that release of the requested information will not cause substantial harm to the competitive positions of the NHP importers in question because similar information is already publically available.  *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 20-22; Pl.'s Reply, ECF No. [31], at 10-11.  For example, Worldwide Primates, the company for whom Mr. Block is an executive officer, provides a listing of the animals it imports on its website:

- **Cynomolgus monkeys** *(Macaca fascicularis)*
  Origin: China, Indonesia, Mauritius
  Weight range: 1.7-8.0 Kg.
- **Rhesus monkeys** *(Macaca mulatta)*
  Origin: China
  Weight range: 1.8-8.0 Kg.
- **Caribbean and African Green monkeys** *(Chlorocebus aethiops/sabeus)*
  Origin: East Africa/St. Kitts/Barbados
  Weight range: 2-6 Kg.
- **Olive Baboon** *(Papio anubis)*
  Origin: East Africa
  Weight range: 3-25 Kg.
- **Common Marmosets** *(Callithrix jacchus)*
  Origin: USA and overseas breeding colony
  Weight range 250-450 grams
- **Squirrel monkeys** *(Saimiri scuireus)*
  Origin: Guyana
  Weight range: 500-900 grams

*See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 21; Goodman Decl., ECF No. [23-4], ¶ 12; and Exhibit K to Goodman Decl., ECF No. [23-15] (emphasis in original).  PETA also cites the websites of several other NHP importers, which advertise various species imported by the

companies, inventory capacity of an importer's domestic housing facilities, and in one case, an importer's price list for NHPs. *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 21-22; Goodman Decl., ECF No. [23-4], ¶¶ 11-17; and Exhibits L, P, and Q to Goodman Decl., ECF Nos. [23-15, 23-20, 23-21].  PETA also argues that in some cases, NHP importers advertise the primate cages that the company uses for sale and provides information about them on their websites. *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 21-22; Goodman Decl., ECF No. [23-4], ¶ 15; Exhibits N and O to Goodman Decl., ECF Nos. [23-18, 23-20].  PETA further argues that in a few cases, NHP importers publicly advertise their relationships with certain exporters, and that even where the importers themselves do not advertise these relationships, the exporters' services are advertised in public listings. *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 23-25; Goodman Decl., ECF No. [23-4], ¶¶ 11, 17, 18; Exhibits I, M, Q, and R to Goodman Decl., ECF Nos. [23-13, 21-17, 21-21, 23-22].  Finally, with regard to the names of the airline carriers, PETA argues that this information is not commercially valuable because there is a publicly available list of airlines that are legally registered to ship primates for experimentation. *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 27; Goodman Decl., ECF No. [23-4], ¶ 19; Exhibit S to Goodman Decl., ECF No. [23-23].

Upon review of the parties' submissions and the record before the Court—which includes the 1575 pages of responsive records produced by CDC, with redactions, to PETA—the Court finds that CDC has *not* met its burden of showing that the NHP importers in question would be substantially harmed by the disclosure of the *names of the species imported*.  However, CDC has met its burden of showing that the NHP importers in question would be substantially harmed if CDC were to disclose the remaining four categories of information—the *quantity of animals*

*imported*, the *descriptions of crates used in shipments*, the *names of the companies that export the animals*, and *the names of the airline carriers that transport the animals*.

At the outset, the Court observes that the 1575 pages of responsive records produced by CDC already contain *extensive* disclosures of the names of the animal species imported by the ten NHP importers at issue during the twelve-month time period at issue. *See* Documents Produced to Plaintiff on 6/4/2015 and 7/8/2015, ECF Nos. [33-1] - [33-5]. The records produced by CDC disclose, at least in part, the names of animal species imported by *nine of the ten* NHP importers in question. *See id.*[13] Such extensive disclosure undercuts CDC's argument that the names of the species imported by each individual NHP importer constitute valuable commercial information that can be used by competitors to gain an advantage over the importer submitting that information. CDC's argument is further undercut by Plaintiff's production of evidence demonstrating that in many instances, the names of species imported by NHP are publically available. *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 21-22; Goodman Decl., ECF No. [23-4], ¶¶ 12-13; and Exhibits K and L to Goodman Decl., ECF Nos. [23-15, 23-16]. Accordingly, the Court finds that CDC has failed to meet its burden with respect to the *names of the species imported*.

Having found that disclosure of names of the species imported would not cause substantial harm to the NHP importers, the Court now turns its attention to the four remaining categories of information—the *quantity of animals imported*, the *descriptions of crates used in shipments*, the *names of exporters*, and *the names of the airline carriers*. The Court finds that these four categories

---

[13] CDC redacted every reference to a species name for only one NHP importer, Valley Biosystem, and that NHP importer only submitted seven documents. *See* Documents Bates Stamped 0663-0669, ECF No. [33-4]. For some NHP importers, every reference to a species name was disclosed. *See, e.g.*, Documents Bates Stamped 0591-0662, ECF No. [33-3]. For other NHP importers, references to species names were redacted sporadically. *See* Documents Bates Stamped 0001-00590, 0670-1571, ECF Nos. [33-1], [33-2], and [33-5].

of information constitute valuable confidential information, which, if disclosed, would cause substantial harm to the NHP importers submitting this information. The record evidence indicates that in the particular market at issue in this case—the NHP importation market—there are a "limited number of licensed importers . . . and they operate in a very competitive environment." Block Decl., ECF No. [28-2], at 2. The record evidence also indicates that NHP importers have taken considerable efforts to develop and protect business models effectuating the cost-effective transport of nonhuman primates into the United States through strategic relationships with exporters and airlines. *See id.* at 2-3. The disclosure of the *names of exporters* and the *names of airline carriers* on a shipment-by-shipment basis for the twelve-month time period at issue would enable competitors to gain an edge in this competitive market by obtaining valuable business data regarding the affected importer's "supply chains, patterns of importation . . . and business relationships." *Watkins*, 643 F.3d at 1200; *see also Gilda Industries*, 457 F. Supp. 2d at 10 (finding that disclosure of an importer's "sources of supply, product lines, supply chains and customers" would result in substantial harm to the importer). Furthermore, the disclosure of the *quantity of species* and the *quantities and sizes of crates* used during the importation process, when paired with the names of species, would provide competitors with valuable, detailed business data concerning each importer's capacity to import specific species and each importer's volume of business on a shipment-by-shipment basis. *See* Block Decl., ECF No. [28-2], at 3; *see also Customs & Int'l Trade Newsletter,* 588 F. Supp. 2d at 56 (holding that the quantity of products imported on a shipment-by-shipment basis constitutes confidential information). Such a disclosure could provide a competitive advantage to competitors, and enable competitors to interfere with an importer's supply of such species. *See* Block Decl., ECF No. [28-2], at 3. Specifically, "the release of the quantity and species could enable a competitor to calculate the percentage of sales based on a particular species, and use that information when analyzing

market share and other types of commercial business parameters, which would result in financial and competitive harm as these competitors attempt to increase their market share." *Id.*

PETA argues that these categories of information are not commercially valuable in the NHP importation market because PETA believes similar information is already publicly available. PETA's argument is unavailing because none of the publicly available information cited by PETA involves *shipment-by-shipment data* that would reveal details regarding each importer's business relationships, importation capacity, and supply chains. Rather, the publicly available information cited by PETA largely involves generalized industry-wide information—such as an aggregate list of airlines that are legally registered to ship primates for experimentation and a public list of exporters that provide services related to the exportation of primates. *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 23-25; *see also* Exhibit D to Notice of Supplemental Authority, ECF No. [34-4].[14]   Moreover, the fact that there is some publicly available information concerning some business agreements between NHP importers and exporters does not alter the Court's analysis. If the names of exporters were disclosed in the records at issue, competitors could pair those names with other publicly available data—including the information cited by PETA—as well as other information disclosed in the records at issue, to "reverse-engineer the company's business model and thereby discover unique, otherwise unidentifiable advantages that it provides." Block Decl., ECF No. [28-2], at 3.

The Court also finds unavailing PETA's argument that the NHP importers in question would not suffer substantial competitive harm by the disclosure of the names of airlines carriers and the names of exporters on the grounds that CDC failed to redact this information in two records relating to Charles River, Primate Products, and SBNL USA. *See* Pl.'s Opp'n and Cross-Motion,

---

[14] The Court notes that it has reviewed and taken into consideration Plaintiff's [34] Notice of Supplemental Authority, as well as each of the exhibits attached to Plaintiff's notice.

ECF No. [23-1], at 24, 27; Exhibits V and W to Goodman Decl., ECF Nos. [23-26], [23-27].  Upon

close review of the 1575 pages produced by PETA, the Court observes that the *vast majority* of

the references to the names of exporters and airline carriers have been redacted.  *See* Documents

Produced to Plaintiff on 6/4/2015 and 7/8/2015, ECF Nos. [33-1]-[33-5].  Furthermore, the record

evidence indicates that CDC's redactions are specifically targeted and are made after considering

protection requests by individual importers.  *See* Norris Supp. Decl., ECF No. [27-5], ¶¶ 8-11.  As

such, while the names of exporters and airline carriers are generally considered confidential

information by NHP importers, there may have been a few instances in which individual businesses

did not object to the disclosure of this information.  *See id.*; *see also id.* ¶ 11 ("Some of the

importers had limited objections to the release of information set forth in the responsive documents

provided to CDC").  The fact that several individual NHP importers—which may have slightly

different business models or slightly different business objectives—did not object to a handful of

references to the exporter names and airline names—and therefore that information was released—

does not undermine the collective evidence compelling the conclusion that the general disclosure

of such information, where objected to, would cause substantial competitive harm to the NHP

importers submitting the information.

In light of the foregoing, the Court finds that four categories of information—the *quantity of*

*animals imported*, the *descriptions of crates used in shipments*, the *names of the companies that*

*export the animals*, and *the names of the airline carriers that transport the animals*—constitute

confidential commercial information, which, if disclosed, would cause competitive harm to the

NHP importers in question.  *See Trans-Pac. Policing Agreement v*, 177 F.3d at 1022; *Watkins*, 643

F.3d at 1200; *Gilda Industries*, 457 F. Supp. 2d at 10; *Customs & Int'l Trade Newsletter,* 588 F.

Supp. 2d at 56.

### iii.   Application to Non-Objecting NHP Importers

Having found that that four of the five categories of information requested by Plaintiff constitute confidential commercial information, the Court notes that in this particular case, three of the ten NHP importers submitting the requested information *have elected not to object to the disclosure of that information*.   In a supplemental declaration, CDC's FOIA officer, Katherine Norris, explains:

> There are different redactions, even among similar documents. This is because after the CDC FOIA Office received responsive documents from DGMQ, pre-disclosure notices (PDNs) were sent to all of the importers that submitted documents to CDC during the time period specified by PETA in its FOIA request. Pursuant to the process established under Executive Order No. 12600, each importer was: 1) provided both with a copy of the PETA FOIA request and with copies of the documents submitted by that particular importer which CDC determined to be responsive to the FOIA request; 2) asked to provide a statement explaining how any information in the documents that it designated as being proprietary would, if disclosed, substantially harm its organization or benefit its competitors; and 3) asked to return copies of the responsive documents indicated, by highlighting, the material that it recommended be withheld, if any.

> Seven importers submitted responses to the PDN letters from CDC. The scope and contents of the responses varied among importers. If the concerns expressed by an importer were facially reasonable and consistent with the provisions of the FOIA, CDC applied the level of protection requested by the importer to the information it had been required to submit pursuant to regulation. Consequently, CDC might withhold in full the CITES permits submitted by one importer, partially redact the same forms submitted by another importer, and release in full the forms submitted by a third importer.

> CDC treated the various animal lists submitted by importers similarly. As a result, if the concerns expressed by an importer were facially reasonable and consistent with the provisions of the FOIA, CDC applied the level of protection requested by the importer to the information the importer had been required to submit. Consequently, the animal species, quantities, and crate information were redacted differently.

> After receiving all potentially responsive documents from DGMQ, the CDC FOIA Office used the FOIA statute, case law, official guidance, and generally accepted best practices to make determinations about whether material contained in those documents should or should not be redacted. Some of the importers had limited objections to the release of information set forth in the responsive documents provided to CDC. Therefore, CDC made a good faith effort to provide documents to the Plaintiff to the fullest extent possible without compromising the legitimate stated confidentiality concerns of the importers. Hence, if one importer did not request that certain information be withheld, even though another importer did, CDC released the first importer's information.

Norris Supp. Decl., ECF No. [28-5], ¶¶ 8-11.

Accordingly, the Court finds that the three companies that chose not to object to the disclosure of their information—Central State Primate, Dallas Zoo Management, and SBNL USA— have not proffered that disclosure would harm their companies.  In other words, because these three companies have elected not to object to the disclosure of the requested information—despite having the opportunity to do so—there is a reasonable assumption that these three companies would not face substantial harm by the disclosure of the requested information.  *See* 45 C.F.R. § 5.65 (delineating procedures by which companies submitting information to CDC may object to the disclosure of the requested information on the grounds that the information is "confidential").

In this case, however, CDC has redacted much of the requested information submitted by the three non-objecting companies.  The Court finds that CDC has failed to meet its burden to show that *these three non-objecting companies in particular* would face substantial harm by the disclosure of the requested information in the records that they have submitted.  There is a reasonable inference that these three companies have not objected to the disclosure of their records because they do not believe that they will face substantial harm by the disclosure of such records. In sum, the burden is on the Government to show that disclosure of the records in question would result in a substantial competitive harm on the companies submitting the information at issue, and

the Court finds that with respect to these three non-objecting companies—Central State Primate, Dallas Zoo Management, and SBNL USA—the Government has not met that burden.  *See Multi Ag. Media,* 515 F.3d at 1227.

Accordingly, the Court finds that in this case, Plaintiff is entitled to each of the five categories of information that it requests in the records specifically submitted by the three non-objecting companies—Central State Primate, Dallas Zoo Management, and SBNL USA—because CDC has not proffered evidence that these three importers will be specifically harmed

Finally, the Court notes that its finding with respect to the non-objecting companies does not alter its findings with respect to the redactions applied to the records submitted by the seven objecting companies, each of which have submitted evidence to CDC indicating that they will face substantial competitive harm if the information that they have submitted is disclosed.  *See Part.III.B.1.a.ii, supra.*

### b.  Asymmetrical Harm

The Court finds unavailing PETA's argument that even if the disclosed information includes "confidential commercial information," the individual NHP importers in question would not face any competitive disadvantages by the disclosure of the requested information on the grounds that each individual importer would be "symmetrically" disclosing the same types of information.  *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 28-30; Pl.'s Reply, ECF No. [31], at 19-20.[15]  In other words, PETA argues that because all NHP importers would face the *same* disadvantage when disclosing the confidential information, no single NHP importer would face a *competitive* disadvantage.  *See id.*

---

[15] The Court notes that the "leading case" cited by PETA in support of its argument is an unpublished decision from 1991, which pursuant to Circuit Rules, shall not be cited as precedent. *See* Pl.'s Reply, ECF No. [31], at 20; *see also* D.C. Circuit Rule 32.1.

Both parties cite *Biles v. Department of Health and Human Services*, 931 F. Supp. 2d 211 (D.D.C. 2013).   In that case, Judge Royce C. Lamberth expressly held that the "Court does not need to determine whether or not asymmetric disclosure is required for substantial competitive harm . . . precedent suggests that the 'harm' aspect of 'competitive harm' is an *unfair* commercial disadvantage by way of exposure."   *Biles*, F. Supp. 2d at 225 (emphasis in original).   Judge Lamberth went on to find against the Government because it failed to explain why symmetric disclosure "still poses a likelihood of substantial competitive harm" and instead only asserted that "asymmetrical competitive harm has never been required [under Exemption 4.]"   *Id.* (citations omitted).

Here, by contrast, CDC has produced evidence indicating that while licensed NHP importers "may submit the same type of information, the particular information each submits is different based upon the volume of business."   Block Decl., ECF No. [28-2], at 2.   In other words, the release of the requested confidential information would permit competitors of the affected NHP importers "to gain valuable insight into the manner in which [each NHP importer] conducts its business," specifically each company's "capacity to obtain, house and transport NHPs."   *Id.*   Moreover, this information can be used by international companies that are also engaged in the importation of NHPs, but have not been required to submit information to CDC because they have not yet entered the United States market.   *See id.*   In other words, the disclosure of the confidential commercial information at issue in this case would enable existing competitors—and potential competitors—to "increase their own importation, grow their market share, and undercut the profitability of the companies submitting the information."   *Id.*

In light of the foregoing, the Court finds that CDC has met its burden of showing that each NHP importer faces an "*unfair* commercial disadvantage" by the disclosure of the confidential commercial information at issue in this case.   *Biles*, 931 F. Supp. 2d at 224; *see also Citizens for*

*Responsibility & Ethics in Washington v. United States Dep't of Justice*, No. CV 13-1159 (GK), --- F. Supp. 3d ---, 2016 WL 541127, at *9 (D.D.C. Feb. 9, 2016) (finding that companies faced substantial harm where disclosure of "key inside information" to competitors and potential competitors would "undercut the vendor's position in the market").

### c. Staleness of Requested Data

Finally, PETA argues that disclosure of the requested information would not result in substantial harm to the NHP importers submitting the information because the passage of time and changes in the industry have rendered the information "too stale to cause a likelihood of commercial harm." Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 30 (quoting *Biles*, 931 F. Supp. 2d at 227).

In this case, the requested records were submitted between May 2013 and May 2014. Def.'s Stmt., ¶¶ 1-2. PETA asserts that the "primate importation market has changed since 2013" and that as of late 2014, "at least one airlines that previously transported primates to laboratories has stopped doing so." Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 30 (citing Exhibit T to Goodman Decl., ECF No. [24]).

In opposition, CDC contends that the departure of one airline "would not render all the other information PETA requested stale." Def.'s Opp'n and Reply, ECF No. [28], at 26. The Court agrees. Other than the news article describing the departure of the aforementioned airlines, there is no evidence in the record that the NHP importation market has changed at all since May 2004. Furthermore, this case is distinguishable from the cases cited by PETA, *Taylor v. Babbitt*, 760 F. Supp. 2d 80 (D.D.C. 2011), which involved information concerning certification materials that were "commercially valuable when originally submitted in 1935," *id.* at 88, and *Teich v. Food & Drug Admin.*, 751 F. Supp. 243, 254 (D.D.C. 1990), which involved studies that were conducted 20 years prior to the release of the documents.

Finally, PETA contends that, even if the remaining information is not stale, PETA is entitled specifically to information involving "airlines that no longer ship primates to labs." Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 30. In response, CDC contends that the records concerning the departing airlines "may reveal how the departure impacted the industry," and therefore its disclosure would still result in substantial competitive harm. Def.'s Opp'n and Reply, ECF No. [28], at 26. The Court finds CDC's argument persuasive. If information concerning the departing airlines were disclosed in the records at issue, the records would reveal which importers maintained relationships with that airline, and the information could provide valuable information to competitors seeking to gain knowledge of which importers were most affected by the airline's departure from the market.

Accordingly, the Court finds that the information requested by PETA has not become "stale," and that the commercial value of the requested information remains significant.

## 2. Impairment to Government's Ability to Obtain Information in the Future

Having found that disclosure of four of the five categories of requested information would "cause substantial harm to the competitive position of the person from whom the information was obtained," the Court shall also consider whether the requested information can be considered "confidential" on the alternative grounds that disclosure of the requested information would "impair the Government's ability to obtain necessary information in the future." *Nat'l Parks I*, 498 F.2d at 770.[16] The Government may establish impairment by showing that "public disclosure would cause individuals to so narrowly construe the requests for information . . . that the government's information-gathering ability would be seriously impaired." *Washington Post Co. v. HHS*, 865 F.2d 320, 325 (D.C. Cir. 1989); *accord Critical Mass*, 975 F.2d at 878 ("[W]hen dealing with a FOIA request for

---

[16] The Court notes that because CDC has demonstrated substantial competitive harm if the requested information were released, it is not *required* to show that its release also could impair CDC's ability to obtain this information in the future. *See Biles*, 931 F. Supp. 2d at 220 ("HHS contends that both prongs of the test are satisfied as a matter of law (though HHS need only prove one of the prongs to prevail)[.]").

information the provider is required to supply, the governmental impact inquiry will focus on the possible effect of disclosure on its quality."). An "agency's ability to carry out its statutory purpose is impaired, if disclosure of the information affects the quality or reliability of future submissions." *Judicial Watch, Inc. v. Ex-Im Bank*, 108 F. Supp. 2d 19, 30 (D.D.C. 2000).

As a general matter, an impairment claim "is inherently weak where, as here, the agency has secured the information under compulsion." *Niagara Mohawk Power Corp.v. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999). There is "presumably no danger that public disclosure will impair the ability of the Government to obtain this information in the future" if it is "supplied pursuant to statute, regulation or some less formal mandate[.]" *National Parks I*, 498 F.2d at 770. Notwithstanding this general rule, the D.C. Circuit has "since pointed out that there are circumstances in which disclosure could affect the reliability" of the data required to be submitted to the agency. *Critical Mass Energy Project*, 975 F.2d at 878 (citing *Washington Post Co.*, 690 F.2d at 268-69) ("[W]e cannot dismiss the possibility that part-time consultants may construe [the] disclosure requirement narrowly and thus may not disclose all possible [information].").

Here, CDC argues that "because the release of [the requested] information could be harmful to the companies' economic well-being, they naturally will be reticent to provide it in the future." Def.'s Opp'n and Reply, ECF No. [28], at 11. According to CDC, companies would face economic pressures to omit certain information—for example, a partial list of suppliers where more than one supplier was involved—without CDC knowing of the omission. *Id.* CDC also suggests that "when several [primates] are imported, the companies could fail to disclose the accurate number of primates, crates or compartments." Def.'s Motion, ECF No. [17], at 34. CDC contends that these omissions "would prevent CDC from having reliable information to fulfill its regulatory goal of preventing the introduction, transmission or spread of communicable disease from NHPs." *Id.* (citing *Judicial Watch, Inc.*, 108 F. Supp. 2d at 30)

In opposition, PETA argues that it is implausible that "importers will choose to violate federal law by refusing to disclose the information that they are legally required to provide." Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 9.  PETA further contends that CDC's impairment claim fails as a matter of law because it "fails to suggest—let alone prove—why an importer will refuse to provide information mandated by § 71.53(n)(2) in the future." *Id.* at 10.

The court agrees with PETA and finds CDC's arguments unavailing and conclusory.  CDC has not produced any evidence—or pointed to any factual or legal authorities—suggesting that the Government's ability to obtain information in the future would be harmed by the release of the requested information.  As Plaintiff observes in briefing, "in theory, any agency could assert that its ability to obtain information in the future will be impaired because submitters will break the law and withhold information that they are required to provide." Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 9.  If courts were to permit these arguments, the D.C. Circuit's analytical distinction between information submitted voluntarily and involuntarily would be rendered meaningless.  *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n (Critical Mass II)*, 975 F.2d 871, 879-80 (D.C. Cir. 1992) (en banc) (setting forth distinct tests for documents obtained voluntarily and involuntarily).

Accordingly, the Court rejects CDC's contention that the requested information can be considered "confidential" on the alternative grounds that disclosure of the requested information would "impair the Government's ability to obtain necessary information in the future." *Nat'l Parks I*, 498 F.2d at 770.

### C.  <u>Segregability</u>

PETA argues that CDC has failed to reasonably segregate non-exempt information on the grounds that CDC has applied inconsistent redactions to identical documents.  *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 32; Pl.'s Reply, ECF No. [31], at 24.

In response, CDC acknowledges that there are different redactions, even among similar documents.  Norris Supp. Decl., ECF No. [28-5], ¶ 8.  As discussed in Part III.B.1.a.iii, CDC has submitted a supplemental declaration from its FOIA officer, Katherine Norris, which provides unrebutted testimony explaining the alleged inconsistencies.  *See id.* ¶¶ 8-11.  In that supplemental declaration, Ms. Norris has provided a reasonable and plausible explanation for the variances in redactions.  *See id.*; see also *Ancient Coin Collectors Guild v. U.S. Dep't of State,* 641 F.3d 504, 509 (D.C. Cir. 2011) (citation omitted) ("Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail.").  In light of the foregoing, and upon careful review of the record, including the 1,575 pages of records produced by CDC to PETA, the Court finds that CDC has shown with "reasonable specificity" that it has segregated all non-exempt information in its productions to PETA.  *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996).

### D.  Errors in V*aughn* Index

Finally, PETA notes that the *Vaughn* Index submitted by CDC contains inaccuracies and errors that must be corrected.  *See* Pl.'s Opp'n and Cross-Motion, ECF No. [23-1], at 32.  For example, Plaintiff observes that CDC and Ms. Norris state that CDC provided 1,575 pages of responsive records and withheld 146 pages in their entirety.  Def.'s Mem., ECF No. [17], at 44; Norris Decl., ¶¶ 31, 32.  However, the *Vaughn Index* identifies only 111 documents "redacted in full."  *See Vaughn* Index, ECF No. [17-15].  In briefing, CDC acknowledged the mistake, stating that CDC had "reviewed its submission and determined that Ms. Norris' Declaration and HHS' Statement of Material Facts accurately stated that there were 1,575 pages of responsive records and 146 pages were withheld in their entirety."  Def.'s Opp'n and Reply, ECF No. [28], at 27 (citing Norris Supp. Decl., ¶ 6).  CDC also acknowledged that the *Vaughn* Index provided to PETA mistakenly did not state

that 35 additional pages had been redacted in full, but CDC has provided no indication that it has

corrected the *Vaughn* Index and/or provided a revised *Vaughn* Index to PETA.   *See id.*

In addition, the Court notes that the copy of the *Vaughn* Index filed as an attachment to CDC's

Motion for Summary Judgment contains errors in describing the relevant page numbers in its "Order

of Documents.  *See Vaughn* Index, ECF No. [17-15], at 2.  The Court shall require CDC to correct the

errors and inaccuracies described above and shall require CDC to provide a newly corrected *Vaughn*

Index to PETA.  *See Schiller v. N.L.R.B.*, 964 F.2d 1205, 1209 (D.C. Cir. 1992) *abrogated on other*

*grounds by Milner v. Dep't of Navy*, 562 U.S. 562 (2011) ("FOIA litigants are entitled to assume that

the agency's *Vaughn* index is accurate in every detail. And so is the court.").[17]

## IV. CONCLUSION

For the reasons discussed above, the Court shall GRANT-IN-PART and DENY-IN-PART

Defendant's [17] Motion for Summary Judgment, and the Court shall GRANT-IN-PART and

DENY-IN-PART Plaintiff's [24] Cross-Motion for Summary Judgment.  In addition, as described

above, certain issues require further action by CDC:

- As described in Part II.B, *supra*, CDC has impermissibly withheld all requested information with regard to the records submitted by the three non-objecting NHP importers—Central State Primate, Dallas Zoo Management, and SBNL USA.  In addition, CDC has impermissibly withheld one category of information—the *names of the species of animals imported*—with regard to records submitted by all ten NHP importers.  Accordingly, CDC shall, by no later than **September 9, 2016**, produce the records at issue to PETA, disclosing references to the impermissibly withheld information, in accordance with the findings issued in this Memorandum Opinion.

///

///

///

---

[17] The Court notes that in preparing this Memorandum Opinion, the Court relied specifically on the original documents produced by CDC to PETA, and therefore, the errors in the *Vaughn* Index did not affect the Court's analysis.

- As described in Part II.D, *supra*, the *Vaughn* Index submitted by CDC contains errors and deficiencies that require correction.  Accordingly, CDC shall, by no later than **<u>September 9, 2016</u>**, submit a revised *Vaughn* Index to PETA, which corrects the errors and deficiencies discussed in this Memorandum Opinion.

An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge